IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


LEO EDWARD PERRY, JR.,
            Petitioner,

vs.                                                    Case No. 3:08cv323/RV/EMT

EDWIN G. BUSS,[1]
            Respondent.
_____/

## ORDER and REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. 1). Respondent filed an answer and relevant portions of the state court record (Doc. 10). Petitioner filed a reply (Doc. 13).

The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.        BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are undisputed and established by the state court record (*see* Doc. 10, Exhibits).[2] On March 13, 2001, Petitioner was indicted in the

_____

[1] Edwin G. Buss succeeded Walter A. McNeil as Secretary for the Department of Corrections, and is automatically substituted as Respondent. *See* Fed. R. Civ. P. 25(d)(1).

[2] Petitioner stipulates to Respondent's description of the background and procedural history of this case presented in the "Background" section of Respondent's answer (*see* Doc. 13 at 1; Doc. 10 at 1–20). The "Background" section includes Respondent's description of the evidence adduced at trial. Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (Doc. 10).

Circuit Court for Escambia County, Florida, for first degree murder with a weapon based upon the killing of John Johnston on February 21, 1997 (Ex. C at 1–2). Following a jury trial, the jury found him guilty of first degree murder as charged (*id.* at 288–89). The jury additionally found that the murder was premeditated, and the murder was committed during the commission or attempted commission of a robbery (*id.*). The jury recommended imposition of the death penalty (*id.* at 305). On August 26, 1999, Petitioner was sentenced to death (*id.* at 383–96, 411–15).

Petitioner, through counsel, appealed the judgment to the Florida Supreme Court. On October 18, 2001, the state supreme court affirmed the conviction but reversed the death sentence and remanded for a new sentencing proceeding before a new jury (Exs. H, I). Perry v. State, 801 So. 2d 78 (Fla. 2001). On January 25, 2008, Petitioner was resentenced to life imprisonment without the possibility of parole, with a twenty-five (25) year mandatory minimum sentence and pre-sentence credit of one year and 292 days (Ex. J).

Petitioner filed the instant federal habeas action on July 22, 2008 (Doc. 1). Respondent concedes the petition is timely (Doc. 10 at 22–23).

II.     TRIAL EVIDENCE

Review of the evidence adduced at Petitioner's trial provides a helpful context in considering his claims. Katherine Johnson, a front desk clerk at the Motel 6 on Pensacola Boulevard in Pensacola, Florida, testified that she checked in Mr. John Johnston, the victim in this case, on the evening of February 20, 1997, at approximately 8:00 p.m. (Ex. D at 277–83). Ms. Johnson testified that Mr. Johnston rented a single room with one double bed for one night and paid cash (*id.* at 278–81). She testified that Mr. Johnston presented a Texas driver's licence bearing the number TX10621832 and wrote his vehicle tag as a Texas number SDO517; and he presented an AARP discount card (*id.* at 281–82). Ms. Johnson testified that there did not appear to be anyone with Mr. Johnston, and the room was rented to one guest (*id.* at 280–82).

Isabella Guest, the head housekeeper at the Motel 6, testified that on February 21, housekeepers found the body of John Johnston in the bed in the room he had rented the previous evening (*id.* at 242–49). Ms. Guest testified that she looked into the room when advised that the occupant had not checked out (*id.* at 242–45). She saw someone in the bed with the covers pulled

over them with just the feet exposed (*id.* at 247). Ms. Guest testified that she advised Steven Moss, the motel manager, that the room was still occupied (*id.* at 245).

Mr. Moss testified that he was the first person to actually go into the room, and he discovered that Johnston was dead (*id.* at 250–53, 654–55). Once inside the room, Mr. Moss picked up the corner of the bedspread which covered the body (*id.* at 253). Although he did not see Johnston's head because a pillow covered it, Moss did see blood over the neck and chest area (*id.* at 253–54). A guest room key was beside the bed, and Mr. Moss picked it up (*id.* at 254). However, he realized he should leave it, and he replaced it (*id.*). Moss called the sheriff's office (*id.* at 255).

Deputy Robert Martin testified that he arrived at the motel room and secured the scene (*id.* at 261–66). Paramedic Mark Snowden testified that upon his arrival at the motel room, he observed Mr. Johnston's body lying on his back in the bed (*id.* at 270–71). With a gloved hand, Snowden removed the pillow from Mr. Johnston's head to assess his condition and, after determining that he was deceased, replaced the pillow (*id.* at 271–73). Snowden testified that he attempted to minimize disturbance of the scene (*id.* at 273–76).

Robert Taylor, a crime scene investigator, testified that when he arrived at the motel room, he observed that Mr. Johnston's head was covered with a pillow (*id.* at 303–06). He observed blood on the pillow and on the sheets on both sides of Mr. Johnston's head (*id.* at 306). He also observed dark smears of dirt or grease on the pillow in what appeared to be a multi-fingered impression (*id.*). Investigator Taylor observed blood smears on the wall adjacent to the bed, on the side of the bed, and on the wall at the head of the bed (*id.*). Taylor also observed blood spattered on the wall adjacent to the side of the bed and on the headboard and wall behind the headboard (*id.*). Investigator Taylor testified that the sheet covering the body had blood stains and cuts in it (*id.* at 320, 322–23). He testified that the victim's traveling bag, which had not been disturbed, was in the room on a chair (*id.* at 382–86, 972–74). Investigator Taylor testified that a pair of pants, a pair of shoes, and a t-shirt were located beside the bed (*id.* at 326, 337, 340). A rosary was located on the floor with the clothing, and a medallion was found in the victim's shoe (*id.* at 327, 342). A blue plaid shirt laid undisturbed under a chair next to the undisturbed travel bag, with two envelopes in the pocket containing cash in the amount of $1,150.00 (*id.* at 338–39, 383–86). A pair of pink panties was found underneath the bed (*id.* at 369–70). A crack pipe, which proved to have cocaine

residue, was found just underneath the foot of the bed (*id.* at 327, 386–89). A pair of broken sunglasses was on the floor near the wall (*id.* at 328, 339). A towel was found on the bathroom counter (*id.* at 330). Investigator Taylor testified that a Marlboro cigarette butt was collected from a trash can in the bathroom (*id.* at 345). He testified that he collected a light switch plate from the bathroom which appeared to have blood smears on it (*id.* at 346–47). He testified that latent fingerprints were lifted from several surfaces inside and outside the motel room and from several items found in the room (*id.* at 347–52).

Dr. John Lazarchick, a forensic pathologist who was also part of the medical examiner unit of a local hospital, arrived at the scene at approximately 6:00 p.m. on February 21, and began his examination of the body (*id.* at 487–89). Dr. Lazarchick removed the sheet covering the body (*id.* at 490). A bedspread had been removed from the body prior to Lazarchick's arrival (*id.* at 522). The body was lying face up in the bed clad only in a pair of blue bikini underwear, which Dr. Lazarchick pulled down to check body temperature (*id.* at 489, 521). Dr Lazarchick noted an extensive amount of blood on the chest and neck regions (*id.* at 490). Based on his findings concerning rigor mortis, lividity and body temperature, Dr. Lazarchick estimated that death occurred 12 to 24 hours earlier (*id.* at 490–93). When asked about semen later found on the bed sheet, Dr. Lazarchick testified that the presence of semen did not necessarily indicate sexual activity, since semen can sometimes be expressed postmortem due to rigor mortis (*id.* at 492). Dr. Lazarchick also acknowledged that there had been no semen found in the underwear found on the body (*id.* at 530–32).

Dr. Lazarchick testified that he performed an autopsy the following day (*id.* at 494). During the autopsy, Dr. Lazarchick found and identified eight wounds, three incised wounds to the neck, four stab wounds to the chest, and one defensive wound to the left thumb (*id.* at 499–514). The examination also revealed a contusion to the nose, which Dr. Lazarchick testified may have occurred just prior to death or much earlier at an event unrelated to the homicide (*id.* at 497–98, 529). Dr. Lazarchick testified that Wound #1 (using the numbers assigned by Dr. Lazarchick) to the right side of the neck was approximately three inches long and one-and-one-quarter to one-and-one-half inches deep (*id.* at 500–01). The wound was consistent with having been made by a single-edged knife, since one side of the wound had a blunt shape (*id.* at 501–02). Wound #2 was three-and-a-half

inches long, and from superficial to three-quarters of an inch deep (*id.* at 502). This wound severed the jugular vein and would have been fatal by itself (*id.* at 502). Wound #3 was a superficial wound across the neck (*id.* at 504–05). Wound #4 was a stab wound to the central portion of the chest, approximately two-thirds of an inch long and penetrating through bone of the rib cage and into the pericardial sack, which is the sack that encases the heart (*id.* at 507). Dr. Lazarchick testified the wound exhibited blunt and sharp edges and would have required considerable force (*id.* at 507). Dr. Lazarchick testified that this wound, alone, would have potentially caused death (*id.* at 508). Wound #5 was also a stab wound in the middle part of the chest (*id.* at 510). This wound went between the ribs, entered the heart and would have been fatal (*id.* at 510). Dr. Lazarchick testified that this wound also exhibited sharp and blunt edges (*id.* at 510). He explained that the sharp edge shape would have been from the cutting portion of the blade and the blunt shape would have been caused by the area at the hilt of the knife where the blade joins the handle (*id.* at 510). Wound #6 was a stab wound to the chest to the lateral left side (*id.* at 511). This wound also had the blunt and sharp edges (*id.* at 511). The path of the wound went between the ribs and entered the left lung (*id.* at 511). Injuries from the wound may have been fatal without medical treatment (*id.* at 511). Wound # 7 was a very shallow wound, which Dr. Lazarchick described as an attempted stab wound (*id.* at 512). Wound #8 was a superficial incised wound to the thumb, which was consistent with a defensive wound (*id.* at 514).

Dr. Lazarchick rendered no opinion on the exact sequence or timing of the wounds, although he testified that he thought the stab wounds to the chest probably preceded the neck wounds (*id.* at 530, 535–37). He testified that Mr. Johnston's wounds were administered in a relatively short period of time, and death would have occurred within five minutes (*id.* at 517, 533–34). Dr. Lazarchick testified that Mr. Johnston's wounds would have been painful while he was conscious (*id.* at 515–16). He testified that these wounds would have produced unconsciousness and eliminated the victim's ability to feel pain within one minute (*id.* at 517). Dr. Lazarchick also testified that the victim was lying face up in the bed when stabbed (*id.* at 518).

Laura Rousseau, a senior crime laboratory analyst with the Florida Department of Law Enforcement ("FDLE"), testified that she tested the motel room for the presence of blood, and she tested the body for the presence of hairs, fibers, latent fingerprints and semen (*id.* at 419–38). She

testified that using a lumalite process, she found fibers on the body and collected them (*id.* at 421–22). She testified that this process did not detect any fingerprints or semen (*id.* at 422–23). Ms. Rousseau testified that she conducted a presumptive test for blood in the motel room using luminol and phenolphthalein (*id.* at 423–25). In the bathroom, Rousseau testified that she found one area with a reaction for the presumptive tests for blood (*id.* at 424–25). She testified that the sink and counter tops had too much fingerprint powder on them to test for blood (*id.* at 425). Ms. Rosseau testified that testing with luminol on the two walls by the bed with visible stains produced a reaction for blood (*id.* at 426).

Janice Johnson, an FDLE crime laboratory analyst, testified that she examined the blood spatters found at the scene (*id.* at 718–771). Based on her review of crime scene photographs and evidence, Johnson testified that the injuries producing bloodshed occurred on the bed of the motel room (*id.* at 725). She testified that she could not determine the sequence or timing of the wounds (*id.* at 747–50). Ms. Johnson acknowledged that there was a blood spatter on the underside of the bottom of the bedspread (*id.* at 750–54). She testified she could not tell how the bedspread was positioned and could only say that the underside was facing upward (*id.* at 754). Ms. Johnson agreed with Dr. Lazarchick that the victim was lying face up in bed when he was stabbed (*id.* at 725).

Christina Sanders, a fiber analyst with the FDLE, testified regarding the cuts found in the sheet (*id.* at 656–66). She testified that she found eight holes in the top part of the sheet (*id.* at 659). Sanders testified that after making a series of test cuts with different implements for comparison purposes, she concluded that the holes in the sheet were made by a sharp bladed implement (*id.* at 660–66).

FDLE analysts testified regarding the testing of evidence collected at the crime scene. One latent fingerprint belonging to Petitioner was recovered from the inside of a Motel 6 soap wrapper (*id.* at 635–41). No other latent prints of value were lifted from the motel room (*id.* at 640–41). Serology and DNA testing was performed on various items of evidence. Petitioner's DNA was discovered from a blood stain on a towel found in the motel room and from a Marlboro cigarette butt found in the trash can of the bathroom (*id.* at 684–87, 708–13). John Johnston's DNA was found on blood stains found on the bedspread, bed sheet, and the light switch plate from the motel

bathroom (*id.* at 677–79, 683).  A semen stain found on the bottom bed sheet matched Johnston's DNA (*id.* at 679–80).  There was no blood or semen found on the blue bikini underwear Johnston wore (*id.* at 676–77).  Testing on the pink panties found under the bed proved to have a semen stain and two different DNA strands which were inconsistent with both Petitioner and Johnston (*id.* at 680–83).

Audrey Black testified that she and her husband rented the room next to Mr. Johnston's room at the Motel 6 at the time of the homicide (*id.* at 288–89).  She testified that they checked into the room at approximately 5:00 p.m. on February 20, 1997 (*id.* at 289).  She stated that during the night, she heard noises from the room next door (*id.* at 290).  She first heard a sound as if someone fell out of bed and then muffled noises around 4:00 a.m., which would have been February 21 (*id.* at 290, 294). Ms. Black testified that she often awakens during the night and has difficulty going back to sleep (*id.* at 296–97).  She testified that shortly after the muffled noises, she heard a lot of banging sounds from the room (*id.* at 291).  After another brief time, she heard someone walking swiftly and heavily across the floor and then the door slammed (*id.* at 291).  Ms. Black testified that she looked out of the window and saw a man standing on the driver's side of a white pick-up truck (*id.* at 291). She testified that the truck was parked one car away from the Black's own vehicle, which was parked directly in front of Black's room (*id.* at 292).  The man unlocked the truck and went inside (*id.* at 293).  Ms. Black testified that once the man was inside the truck, he fell sideways onto the seat and remained in that position for a minute (*id.* at 293, 300).  She testified that the man then seemed to jump up, start the truck, back out of the space, and drive away (*id.*).  Ms. Black testified that the man appeared to be in a hurry (*id.* at 293).  Ms. Black stated that she did not think the man seemed intoxicated, and he seemed sure of the things he did (*id.* at 300).  From the time she first heard the noises until the man drove away, Ms. Black estimated the time to be twenty (20) minutes (*id.* at 294). On cross-examination, Ms. Black agreed that she told a police investigator that it was a very short period of time from when she first heard the noises until the man drove away, and she admitted that her recollection was probably better at the time she gave the investigator the statement (*id.* at 298). Ms. Black testified that Petitioner looked similar to the man she saw at the Motel 6 (*id.* at 295).

Ernest Burrs, Jr., a patrol officer with the Florida Highway Patrol, testified that he stopped a white Chevrolet pick-up truck for speeding in Palm Beach County (*id.* at 566–67).  Officer Burrs testified that Mr. Ricardo Guzman was driving the truck, and his brother, Miguel Guzman, was a passenger (*id.* at 568).  Burrs testified that Ricardo Guzman produced a Florida ID card and a Texas registration for the truck (*id.* at 568.).  Burrs ran checks on the ID card, the Florida plate, and the VIN of the vehicle (*id.* at 569–70).  He learned that Guzman had a suspended license, and the truck was reported stolen (*id.* at 569–70).

Ricardo Guzman testified that he obtained the truck from a man he met at a service station in Lake Worth (*id.* at 591, 594–95).  Guzman admitted he was a known crack cocaine dealer in the community (*id.* at 603).  He testified that the man at the service station approached him and asked him if he wanted to rent the truck (*id.* at 595–96).  Guzman testified that in the drug trade, this meant the man wanted to loan the truck to him for a couple of hours in exchange for drugs (*id.* at 596).  Guzman testified that the man wanted crack, but Guzman did not have any (*id.* at 596, 603–04).  Guzman gave the man $20.00 in exchange for his (Guzman's) use of the truck (*id.* at 596).  When Guzman returned with the truck, he could not find the man (*id.* at 597).  Mr. Guzman testified that he kept the truck and changed the tags (*id.* at 599–600).

Ricardo and Miguel Guzman were arrested and the truck was impounded (*id.* at 570–75).  The Escambia County Sheriff's Office secured the truck the next day (*id.* at 575, 606–08).  With the help of Ricardo Guzman, law enforcement recovered the paperwork for the truck, the Texas tag which had been on the truck, and a plaid jacket from the truck (*id.* at 609–12).  The truck belonged to John Johnston, the victim (*id.* at 447–49).  Petitioner's fingerprints were later discovered on a plastic bag found in the truck (*id.* at 650–51).  Mr. Johnston's DNA was found on a stain on the blue jeans recovered from the truck (*id.* at 687).

Leo Rile, the manager of a motel in Lake Worth, testified that a man staying in his motel drove a white truck similar to the truck seized from Guzman (*id.* at 559–60).  Riley testified that the man stayed with another man, Dee Taylor, who rented a room by the week (*id.* at 560–62).  Riley described the man with the white truck as five feet eight or nine inches tall with medium-length hair and a mustache (*id.* at 561).  Mr. Riley noted that the second night, the man no longer had the truck (*id.* at 562–63).

Janice Effifger, an employee of Western Union Financial Services, testified that records showed wire transfers of money to Petitioner in February 1997 (*id.* at 543–49). She testified the transfers were dated February 21, 23 and 26, in the amounts of $30.00, $20.00, and $15.00, respectively (*id.* at 545–47). She testified that identification was required to pick up each transfer, and all three were picked up in Lake Worth (*id.* at 545–47).

Bradley Tollefson, a detective with the New Orleans Police Department, testified that he took Petitioner into custody in New Orleans on November 5, 1997 (*id.* at 617–20). John Sanderson, an investigator with the Escambia County Sheriff's Office, testified that he and another investigator, Tracy Yuhasz, transported Petitioner from New Orleans to Escambia County, Florida (*id.* at 451–55). Investigator Sanderson testified that he interviewed Petitioner during the drive back, and Investigator Yuhasz sat in the back seat of the car taking notes (*id.* at 454–55, 472). Petitioner told the investigators he was hitchhiking south from Chicago, and John Johnston picked him up somewhere in Alabama and gave him a ride (*id.* at 459). Petitioner told the investigators he and Johnston stopped in Pensacola and stayed at the Motel 6 (*id.* at 459, 463). Petitioner told the officers Johnston was not a heterosexual (*id.* at 458). Petitioner said, while he was in the motel room, Johnston tried to get into the shower with him (*id.* at 458). Petitioner did not mention any other sexual advance or assault by Mr. Johnston (*id.* at 458–59). Petitioner told the investigators that he took Mr. Johnston's wallet and stabbed him with a boot knife (*id.* at 461, 1041–42). Petitioner stated that before the stabbing, he had been in a bar all night with two women he did not know, and the women drove him back to the motel (*id.* at 459). Petitioner pointed out the bars he spent time in that night (*id.* at 474–76). He told Investigator Sanderson that the crack pipe found in the room was probably his (*id.* at 460). He also said he was smoking crack cocaine that night but was not smoking it at the time of the homicide (*id.* at 460–62, 477–79). According to Sanderson, Petitioner said he took Mr. Johnston's wallet from the room and drove south in the truck eight or nine hours, stopping in Lake Worth (*id.* at 461, 481).

Petitioner testified in his own defense and related the circumstances of his involvement in Mr. Johnston's homicide (*id.* at 799–963). Petitioner testified he was born in 1969, and since he was fourteen (14) years old, he had worked with traveling carnivals and shows (*id.* at 800–04). He testified he started as a "ride jockey," and later had more responsible jobs requiring supervision of

other workers in the setting up and operation of the rides (*id.* at 804–05). During the year preceding his trip to Florida, Petitioner worked as ride superintendent for Midways Shows in Chicago (*id.* at 805). He testified that work was slow in the winter months in the north, so he left Chicago and hitchhiked toward Homestead, Florida, where work was available (*id.* at 805–07, 813–14). Petitioner testified that Mr. Johnston gave him a ride somewhere in Alabama on the morning of February 20, 1997 (*id.* at 807–08). He testified that during the ride, Johnston asked him about his life, and they discussed politics (*id.* at 808–09). Petitioner learned that Johnston used to teach school (*id.* at 809). Petitioner testified they stopped at a Waffle House, where Johnston bought Petitioner a meal (*id.* at 810). Petitioner testified that Johnston paid for the meal with money he took from his shirt pocket (*id.* at 811–12). Petitioner said he left Chicago with $68.00 and had approximately $50.00 when Johnston gave him a ride (*id.* at 810–11). Petitioner testified they later stopped for fuel, but Petitioner did not see Johnston pay for it because Petitioner operated the pump (*id.* at 812–13).

Petitioner stated he periodically napped during the trip, and after dark, Johnston woke him and stated he planned to stop in Pensacola for the night (*id.* at 813–15). Petitioner stated Johnston offered to allow him to stay in his motel room for the night if he wanted to ride further with him the next day (*id.* at 814–15). Petitioner accepted the offer (*id.* at 815). He testified they stopped at a Motel 6 and Johnston rented a room (*id.*). Petitioner stated he did not see the rental transaction and did not know how Johnston paid for the room (*id.* at 816). Petitioner testified Johnston told him that he rented a room with one bed, and Petitioner could sleep on the floor (*id.* at 816). Petitioner had his sleeping bag with him and readily agreed to the arrangement (*id.*). Petitioner testified that the room was small, and Petitioner placed his traveling bag along the wall underneath the television (*id.* at 817). He testified he thought Johnston brought one bag inside (*id.* at 817–18). Petitioner wanted to shower, so he took his shaving kit and a change of clothes to the bathroom (*id.* at 819). He testified that while he was in the shower, Johnston came in to use the restroom (*id.* at 820). Petitioner stated Johnston flushed the toilet and went to the sink area (*id.* at 820–21). Petitioner testified he thought Johnston was waiting for him to get out of the shower (*id.* at 821). Johnston then approached the shower (*id.* at 821). Petitioner testified he (Petitioner) put up his hand and just touched Johnston and said he would be out in a few minutes (*id.* at 821). He stated Johnston nodded

and left the bathroom (*id.* at 821). Petitioner stepped out of the shower and shaved (*id.* at 821–22). He testified he cut himself and used a towel to wipe blood from his neck (*id.* at 822). Petitioner testified he told Johnston that he was going to a convenience store to buy cigarettes and left the room (*id.* at 822).

Petitioner testified that after buying beer and cigarettes at the convenience store, he walked to the Cougar Bar (*id.* at 822–37). He stated he arrived at approximately 9:00 p.m. (*id.* at 826–27). He testified he drank two beers and began shooting pool for shots of tequila (*id.* at 827–28). His pool game was successful, and he won six of eight shots of tequila, which he followed with three or four beers (*id.* at 828–29). Petitioner testified that a man offered to sell him Xanax, and he bought five or six pills (*id.* at 829–30, 834–35). Petitioner admitted that he had an alcohol dependency and was addicted to amphetamines and crack cocaine (*id.* at 830–33). He continued to drink and play pool until he left the bar between 11:30 and midnight (*id.* at 836). Petitioner testified that the girlfriend of a man he met at the bar wanted to buy a portable CD player from Petitioner, so the couple drove Petitioner back to the motel to get the CD player (*id.* at 836). Petitioner testified that Johnston was still awake watching television and opened the door when Petitioner knocked (*id.* at 837). Petitioner sold the CD player for $10.00 (*id.* at 838). Petitioner testified the man and his girlfriend told Petitioner they could not give him a ride to another bar, and they drove away (*id.* at 838). Petitioner decided to walk to the bar, and before he left, Johnston told him to take the room key with him (*id.* at 838–39). Petitioner testified he was intoxicated by that time (*id.* at 840). Petitioner started walking to the Silver Eagle Saloon (*id.* at 839–40). When he reached the bar, he found one man shooting pool and another sitting at the bar (*id.* at 841). Petitioner testified he became acquainted with the men and played pool for drinks (*id.* at 841). The man he played with asked Petitioner if he smoked crack (*id.* at 841). Petitioner walked outside with the man, and they shared a $20.00 piece of crack (*id.* at 842). They continued to play pool and drink (*id.* at 842–43). Petitioner estimated he drank several more beers and had three shots of tequila (*id.* at 843). He testified that he asked the man about obtaining more crack (*id.* at 844). He and the man started walking through some woods to Escambia Arms (*id.* at 844). However, they heard gunfire, and turned around and returned to the bar (*id.* at 844). Petitioner testified that two women had driven up to the bar, and the man told Petitioner they would know where to buy crack (*id.* at 844–45).

Petitioner stated he contributed a few dollars and went with them (*id.* at 845–46). Petitioner testified there was a 64-quart Coleman cooler on the backseat containing three-quarters of a case of beer (*id.* at 845). He testified that they eventually found crack to buy, and Petitioner rode around with the women drinking beer and smoking crack (*id.* at 845–49). Petitioner testified he used the metal crack pipe the man at the bar had given him earlier (*id.* at 847–48). He estimated he smoked $30.00 to $35.00 worth of the crack supplied by the women and drank several of their beers (*id.* at 846–49, 852). Petitioner testified the sun was beginning to rise when the women drove him to the motel parking lot (*id.* at 849–53). He stated he drank one more beer, and when he got out of the car, he stumbled and fell (*id.* at 851–52). Petitioner estimated he drank six (6) beers in the car (*id.* at 852). According to Petitioner, the effects of drinking alcohol, taking Xanax, and smoking crack were like being on a roller coaster—one minute he felt paranoid and the next minute he wanted to sleep (*id.* at 850).

Petitioner testified that when he reached the motel room, he pounded on the door to awaken Johnston to let him inside, because he had forgotten he had a room key (*id.* at 852–53). He testified Johnston was somewhat upset (*id.* at 853). Petitioner testified he used the bathroom, left the bathroom light on and cracked the door, and unrolled his sleeping bag on the floor next to the wall at the foot of the bed (*id.*). He testified that the room was small, but there was just enough room to walk between the foot of the bed and his sleeping bag (*id.* at 855). He stated he used his duffle bag as a pillow (*id.* at 853–54, 856). Although Petitioner could not specifically remember all of his actions, he said his habit while sleeping on the road was to empty his pockets and put items on the side of his bag next to the wall (*id.* at 856). He also would place his boot knife in the same location (*id.*). He testified that the boot knife was a double-edged knife with a two to three-inch blade and a sheath designed to clip inside the top of a boot (*id.* at 856). Petitioner stated he carried the knife for protection since his job sometimes required him to carry large sums of cash when he picked up money boxes from the carnival rides (*id.* at 856–57). He testified that when he first sat down on his sleeping bag, light was shining in his eyes, so he flipped his sleeping bag around (*id.* at 854).

Petitioner testified that after he had been asleep for a time, he awoke to find Johnston standing next to him, masturbating with his penis close to Petitioner's face (*id.* at 863–65). Petitioner stated he reacted and jumped up (*id.* at 864). Petitioner testified that he did not remember

exactly what happened because he was still under the effects of his intoxicated state and had just awoken (*id.* at 863–67). Petitioner testified he did not even remember striking Johnston (*id.* at 865–66). He testified he next remembered sitting in a chair in the room, holding the knife with blood on his hands (*id.* at 863–69). He testified Johnston was in the bed covered with blood (*id.* at 868–69). Petitioner testified he did not remember what he did, and was feeling paranoid because of the cocaine use and intoxication (*id.* at 869). Petitioner testified he covered Johnston's face with a pillow and pulled the blanket and bedspread over the body (*id.* at 869–70). Petitioner testified he was panicked, and the only thing on his mind was to leave (*id.* at 870, 877). Petitioner testified he washed his hands, put his belongings in his duffle bag and placed them near the door (*id.* at 870). Petitioner grabbed the keys and ignition security chip to Johnston's truck from the end table and went out the door (*id.*). Petitioner testified he did not go through Johnston's luggage or property, even though he had seen Johnston take cash from his shirt pocket (*id.* at 872, 876). He testified he found Johnston's wallet in the glove compartment of the truck and took $60.00 (*id.* at 872–73, 875–76).

Petitioner testified he discarded the knife somewhere along the highway (*id.* at 874). Petitioner stated he drove the truck south and stopped in Lake Worth, an area with which he was familiar (*id.* at 877–80). He stated he rented the truck to Guzman in order to buy drugs, and he never again saw the truck (*id.* at 883–86). Petitioner testified he worked in a labor pool for a while and then started traveling with carnivals and shows in Florida, New Jersey and New York (*id.* at 887–89). He testified he was arrested in November in New Orleans (*id.* at 889–91).

In rebuttal, the State called Dr. Harry McClaren, a clinical psychologist, to testify (*id.* at 997). Dr. McClaren testified he had not examined Petitioner but was present in the courtroom during Petitioner's testimony (*id.* at 781–91). Dr. McClaren based his testimony upon Petitioner's testimony and his review of depositions and police reports (*id.* at 999–1000). Dr. McClaren testified that Petitioner was able to engage in purposeful or intentional behavior on the night of the homicide (*id.* at 1000–02). McClaren stated that alcohol dependence, cocaine addition, and barbiturate addiction are classified as specific mental disorders (*id.* at 1008). He testified that based on the amount of alcohol, crack cocaine, and Xanax Petitioner stated he consumed, Petitioner would have been intoxicated but could engage in purposeful, goal-oriented, intentional behavior and make

decisions at the time of the murder (*id.* at 1000, 1008–09). Dr. McClaren stated that among persons who heavily consume alcohol, "blackouts" or alcohol amnesic experiences are common (*id.* at 1009–10). He testified that the person would have no recall of his or her behavior during the blackout period (*id.* at 1010). He further testified that because of Petitioner's alcohol use, it was possible that Petitioner could have had a blackout (*id.* at 1010). McClaren also stated that there was nothing in his review to indicate that prior to the event Petitioner had formed a specific intent to kill (*id.* at 1010–11).

Melissa Perry, Petitioner's ex-wife, testified that Petitioner called her from jail after his arrest (*id.* at 1014–15). She stated she asked him what had happened, and he told her he was scared to talk over the telephone (*id.* at 1018). Ms. Perry testified that Petitioner told her that while he was taking a shower getting ready to go out to some bars, the man tried to get in the shower with him (*id.* at 1015–16, 1018). He told her they had an altercation, and he (Petitioner) did not remember later events (*id.* at 1018). Ms. Perry testified that the only other thing Petitioner told her was that when he realized Johnston was dead, he panicked, took the keys, and left (*id.* at 1019).

Louis Ellis, a long-time friend of John Johnston's, testified that he had known Johnston since 1947 (*id.* at 1024). He testified Johnston led a very private life, but Ellis never had any indication that Johnston was a homosexual (*id.* at 1025–27). Ellis testified he had not seen Johnston often during the last ten to fifteen years, since Johnston was teaching at a different school (*id.* at 1027–28). Ellis testified that when Johnston retired, he saw him approximately once a month for a lunch or dinner (*id.* at 1028–29).

William Johnston, John Johnston's brother, testified that he never saw indications that his brother was a homosexual (*id.* at 1030–32).

Audrey Black, the motel guest in the room next door to the crime scene, testified that she did not hear anyone pounding on the door of the adjacent room (*id.* at 1036–37). She admitted that she was not awake all night and slept for a time (*id.* at 1037).

Investigator Tracy Yuhasz, who took notes during Investigator John Sanderson's interview with Petitioner, testified that her notes reflected that Petitioner said he took Johnston's wallet out of the motel room, not that it was in the vehicle, and Petitioner did not mention that Johnston stood over him masturbating (*id.* at 1040–42). Investigator Yuhasz testified that her notes also reflected

that Petitioner said he cut the victim with a boot knife (*id.* at 1042). Yuhasz stated that the car in which they were traveling was equipped with a device for making audio recordings, but it was not activated (*id.* at 1045). She admitted that a recording would have been beneficial (*id.*).

III. STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[3] The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court

---

[3] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id., 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), overruled on other grounds by Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion." Williams, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see e.g. Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the

decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

IV.    PETITIONER'S CLAIMS

Ground One: "Evidence Insufficient."

Ground Two: "Evidence Insufficient."

Petitioner claims the evidence was insufficient to support a finding of guilt beyond a reasonable doubt as to either premeditated murder or felony murder arising during the robbery (Doc. 1 at 4, attached supporting memorandum). As to premeditated murder, he contends his confession and testimony showed that the killing was the unintentional product of his impulsive overreaction to a perceived threat while he was under the influence of alcohol and cocaine (Doc. 1, supporting memorandum at 1–11). He argues that even the State's witness, Dr. McClaren, testified that there was nothing to indicate that Petitioner formed a specific intent to kill before the act (*id.*). Petitioner further contends the State's circumstantial evidence was insufficient to prove premeditation and failed to refute the evidence establishing an unintentional homicide (*id.*).

As to the felony murder, Petitioner contends there was insufficient evidence of his intent to commit a robbery or theft during the homicide (Doc. 1, supporting memorandum at 11–14). He argues that in his confession to law enforcement and his trial testimony, he stated he took Johnston's truck and wallet as a means to flee and an afterthought (*id.*). Therefore, he was convicted in violation of the Fifth and Fourteenth Amendments (*id.* at 1, 11, 14). Petitioner asserts he exhausted

his claims by raising them on direct appeal of his conviction to the Florida Supreme Court (*id.* at 4–5, 10–11, 14).

Respondent contends the Florida Supreme Court's adjudication of both claims comports with the standard set forth in <u>Jackson v. Virginia</u>, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Doc. 10 at 23–33). Therefore, Petitioner is not entitled to federal habeas relief.

        1.     Clearly Established Federal Law

As an issue of federal law, Petitioner's claim derives from the Fourteenth Amendment due process requirement that the evidence presented at trial be sufficient to convict. In determining whether Petitioner's conviction was obtained with constitutionally infirm evidence, reference must be made to the substantive elements of the offense as defined by state law. <u>Jackson v. Virginia</u>, 443 U.S. 307, 324 & n.16, 99 S. Ct. 2781, 2792 n.16, 61 L. Ed. 2d 560 (1979). To satisfy the constitutional requirement of due process during trial, the State must prove beyond a reasonable doubt every fact that constitutes an essential element of the crime charged against the defendant. <u>In re Winship</u>, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073, 25 L. Ed. 2d 368 (1970). When reviewing a claim of insufficient evidence, the proper inquiry is not whether the reviewing court itself believes that the evidence established guilt beyond a reasonable doubt, but "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 319 (citation omitted). The court should not reweigh the evidence but should view it in the light most favorable to the jury's verdict. *Id.* Because jurors are free to evaluate the credibility of testimony and the weight of the evidence, the court should assume that all conflicting inferences were resolved against the defendant. *Id.* at 326. The test under <u>Jackson</u> is a limited one, and it does not require that the evidence rule out every hypothesis except that of guilt beyond a reasonable doubt. *Id.*; <u>Wilcox v. Ford</u>, 813 F.2d 1140, 1143 (11th Cir. 1987). "The simple fact that the evidence gives some support to the defendant's theory of innocence does not warrant the grant of habeas relief." <u>Wilcox</u>, 813 F.2d at 1143.

In Florida, when the state relies upon purely circumstantial evidence to convict an accused, the evidence must not only be consistent with the defendant's guilt but also inconsistent with any reasonable hypothesis of innocence. <u>Davis v. State</u>, 703 So. 2d 1055, 1059 (Fla. 1997). Even in a

purely circumstantial evidence case, the State is not required to rebut conclusively every possible variation of events that could be inferred from the evidence, but only to introduce competent evidence that is inconsistent with the defense's version or theory of events. State v. Law, 559 So. 2d 187, 188–89 (Fla. 1989). However, the federal due process standard does not require the exclusion of any reasonable hypothesis of innocence. *See* United States v. Herrera, 931 F.2d 761, 763 (11th Cir. 1991) (under federal law, it is not necessary that the evidence exclude every reasonable hypotheses of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt) (citations omitted); *see also* Holland v. United States, 348 U.S. 121, 139–40, 75 S. Ct. 127, 137–38, 99 L. Ed. 150 (1954) (rejecting the view that where the Government relies on circumstantial evidence, it must "exclude every reasonable hypotheses other than that of guilt").

2.      Federal Review of State Court Decision

In Petitioner's initial brief on direct appeal of his conviction to the Florida Supreme Court, he argued the trial court erred in denying his motion for judgment of acquittal as to both theories of first degree murder, premeditation and felony murder, since the evidence was insufficient to prove premeditation or the underlying felony of robbery (Ex. E at 38–45). As to premeditation, Petitioner contended his confession and testimony showed that the killing was the unintentional product of his impulsive overreaction to a perceived threat while he was under the influence of alcohol and cocaine (*id.* at 38). He argued that even the State's witness, Dr. McClaren, testified that there was nothing to indicate that Petitioner formed a specific intent to kill before the act (*id.*). Petitioner argued the State's circumstantial evidence was insufficient to prove premeditation and failed to refute the evidence establishing an unintentional homicide (*id.* at 38–40, 42). As to felony murder, Petitioner argued that in both his confession and testimony, he stated he took the truck and wallet as a means to flee, and the takings were an afterthought (*id.* at 42–43). He argued the State presented no evidence to refute this evidence (*id.*). Additionally, the fact that none of the victim's other belongings were disturbed, including $1,150.00 in the pocket of the victim's shirt, supported his assertion that he did not intend to rob Johnston (*id.* at 43, 45). Petitioner contended the trial court's error in denying the motion for judgment of acquittal violated his rights under the Fifth, Sixth, and Fourteenth Amendments (*id.* at 42, 45).

The Florida Supreme Court rejected Petitioner's claims as follows:

> Perry next contends that the trial court erred in failing to grant his motion for judgment of acquittal because the State failed to present sufficient evidence of premeditation. A motion for judgment of acquittal should be granted in a circumstantial evidence case if the State fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. *See* Orme v. State, 677 So. 2d 258, 261–62 (Fla. 1996).FN6
>
> > FN6. This, however, is not a wholly circumstantial case. Perry told the Escambia County deputies who arrested him in New Orleans that he stabbed Johnston and took his wallet from the motel room and at trial admitted being in the motel room with Johnston, having a bloody knife in his hand after Johnston was dead, and fleeing the scene with some of Johnston's property. A confession is direct, not circumstantial, evidence of guilt. *See* Walls v. State, 641 So. 2d 381, 390 (Fla. 1994). Moreover, Perry's fingerprint and traces of his blood were found in the room. *See* Orme v. State, 677 So. 2d 258 (Fla. 1996).
>
> > [The court's] view of the evidence must be taken in the light most favorable to the state. The state is not required to "rebut conclusively every possible variation" of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events.
>
> State v. Law, 559 So. 2d 187, 189 (Fla. 1989) (citations omitted). The trial court's finding denying a motion for judgment of acquittal will not be reversed on appeal if there is competent substantial evidence to support the jury's verdict. *See* Orme, 677 So. 2d at 262.
>
> "Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill." Green v. State, 715 So. 2d 940, 943 (Fla. 1998). This purpose to kill must exist for such a time before the homicide "to permit reflection as to the nature of the act to be committed and the probable result of that act." *Id.* at 944. Premeditation can be shown by circumstantial evidence. *See* Woods v. State, 733 So. 2d 980, 985 (Fla. 1999). Whether the State's evidence fails to exclude all reasonable hypotheses of innocence is a question of fact for the jury. *See* Cochran v. State, 547 So. 2d 928, 930 (Fla. 1989). As this Court has stated:
>
> > Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the

manner in which the homicide was committed, and the nature and manner of the wounds inflicted.

Green, 715 So.2d at 944 (quoting Holton v. State, 573 So. 2d 284, 289 (Fla. 1990)). Moreover, whether premeditation exists is a question of fact for the jury, but the jury is not required "to believe the defendant's version of the facts when the State has produced conflicting evidence." Spencer v. State, 645 So. 2d 377, 381 (Fla. 1994); see also Finney v. State, 660 So. 2d 674 (Fla. 1995); Cochran, 547 So. 2d at 928.

Perry argues that his confession and trial testimony evidenced the killing was the unintentional product of Perry's impulsive overreaction to a perceived threat while he was under the influence of alcohol and cocaine. The "perceived threat," as explained by Perry, was the alleged sexual advance of the seventy-five year old victim made while Perry, after retiring for the evening, was lying on the floor in his sleeping bag at the foot of Johnston's bed. The State argues that Perry's self-serving testimony was internally inconsistent and inconsistent with evidence presented by the State, and the State produced sufficient evidence for the jury to find that Perry committed this murder in a premeditated manner.

Indeed, Perry's version of the events leading to Johnston's murder is contradicted by the evidence presented at trial. The State presented evidence which pointed to holes in the top part of the sheet covering the victim, consistent with those made by a sharp knife. Testimony was also presented which indicated that the victim was lying face up and had the sheet tucked under his arms at the time he was stabbed. In addition, blood spatter was found on the wall and pillows at the head of the victim's bed—and not near the foot of the bed where Perry was lying when supposedly threatened by Johnston. Blood spatter analysis was also consistent with the victim's head being down on his pillow at the time the wounds were inflicted.

In addition, the jury heard that after Perry was arrested in New Orleans, Perry never mentioned to police the version of events he portrayed at trial (i.e., he woke up to Johnston standing over him and masturbating). Rather, Perry told the police he attacked Johnston because of an advance that Johnston made toward Perry while he was "in the shower." Moreover, Perry told his ex-wife the incident was a result of Johnston approaching him "in the shower"; again, he made no mention of the version of events stated by him at trial.

The jury also apparently did not believe Perry's intoxication defense as Perry's own actions on the night of the murder belie his claimed inability to form the requisite intent.FN7 Furthermore, and notwithstanding his own expert's testimony, the State's psychologist concluded that Perry "was able to engage in purposeful, goal-oriented, intentional behavior during the time period surrounding the homicide." Given Perry's self-serving testimony, which was internally inconsistent

and inconsistent with the evidence presented by the State, and because the jury also heard that Perry was convicted five times for crimes involving dishonesty or false statements, the jury was not unjustified in rejecting Perry's version of the incident.

> FN7. Perry testified with clarity as to the specific amounts and types of alcohol and drugs he allegedly consumed on the night of the murder, but later testified he was unsure about the amount he consumed that night. Moreover, despite his consumption of alcohol and drugs, testimony pointed to numerous instances of Perry's purposeful conduct immediately before and subsequent to the murder, such that the jury was justified in rejecting his theory of inability to form intent, e.g., he won all but one of numerous games of pool that he played that evening; upon returning to the motel room, he reversed direction of his sleeping bag because of a light shining in his eyes; after noticing Johnston was dead, he managed to gather all of his belongings, except for a crack pipe under the bed and a pair of broken sunglasses, as well as Johnston's wallet, the truck keys, and the security chip needed to start the truck; and shortly after the time of the murder, a motel guest in the next room testified that she watched someone who looked very similar to Perry drive away in Johnston's truck and the man had no trouble backing the truck out of its parking space and did not appear to be intoxicated.

Although multiple stab wounds alone do not prove premeditation, the nature and location of these wounds do support the finding of premeditation. *See* Rogers v. State, 783 So. 2d 980, 989 (Fla. 2001). As stated in Jimenez v. State, 703 So. 2d 437, 440 (Fla. 1997), the deliberate use of a knife to stab a victim multiple times in vital organs is evidence that can support a finding of premeditation. *See id.* (citing Preston v. State, 444 So. 2d 939, 944 (Fla. 1984)); *see also* Kramer v. State, 619 So. 2d 274, 276 (Fla. 1993) (holding that blood spatter and victim injury evidence can provide a sufficient basis for the conclusion that premeditation existed).

In this case, evidence showed the wounds were to Johnston's chest and neck, both areas where an attack would produce grievous wounds. Four of the seven wounds would have, in themselves, each been fatal. Moreover, "extensive" force was required for at least one chest wound as the knife went through Johnston's chest bone, further demonstrating that the victim was carefully stabbed in a deliberate manner in order to effect death.

Other circumstances are present in this case that support a finding that the killing was the result of a preconceived plan. The State's theory was that Perry's primary motive in killing Johnston was to steal Johnston's property, especially his truck. Perry admitted he had little money and no means of transportation, while

Johnston had both.  The evidence showed that Perry took both Johnston's wallet and his truck, and he later "rented" the truck for money to buy drugs.

Also, as the trial judge indicated in his sentencing order, the evidence established that the knife used to kill the victim had a single-edged blade and, therefore, could not have been the double-edged "boot" knife which Perry carried on his person.  It is therefore logical to assume that the defendant went about obtaining another knife to kill the victim rather than use the defendant's own knife.  That there was no evidence Perry had formed a criminal intent in the days prior to the murder does not preclude the conclusion that Perry formed the necessary intent while Johnston was lying on the bed in his motel room at the time of the murder.FN8

> FN8.  Perry relies on Kirkland v. State, 684 So. 2d 732 (Fla.1996), and Coolen v. State, 696 So. 2d 738 (Fla. 1997), but these cases are factually distinguishable.  This Court held that Kirkland had no motive for killing his victim, used weapons of opportunity, and, apparently, had no preconceived plan.  Here, on the other hand, Perry had a well-planned motive of stealing Johnston's money and truck and used a knife other than his boot knife to kill Johnston.  Coolen and his victim were both intoxicated, and Coolen killed him during "an escalating fight over a beer." *Id.* at 742.  In the instant case the jury rightfully did not believe Perry's self-serving claims that he was too intoxicated to form the intent to kill Johnston.

Therefore, there is competent, substantial evidence supporting the inference of premeditation based upon the inconsistencies between the evidence presented and Perry's account of the circumstances leading to the murder, the nature of Johnston's injuries, lack of evidence of provocation or hostility between Perry and Johnston, and the existence of a plausible robbery motive.  Accordingly, reasonable jurors could reject Perry's theory of non-premeditation and conclude he committed premeditated murder.

Next, Perry contends that the trial court erred in failing to grant his motion for judgment of acquittal because the State failed to present sufficient evidence of intent to commit a robbery or theft at the time of the homicide.  Robbery is "the taking of money or other property which may be the subject of larceny from the person or custody of another when in the course of the taking there is the use of force, violence, assault, or putting in fear."  § 812.13(1), Fla. Stat. (1997).  This Court addressed the standard for establishing a robbery in Jones v. State, 652 So. 2d 346, 349-50 (Fla. 1995).  Property that is the subject of the taking need not be in the actual physical possession or immediate presence of the person who was robbed. *See id.* at 350.  Property is taken from "the person or custody of another" if it is sufficiently under the victim's control so that the victim could have prevented the

taking if she had not been subjected to the violence or intimidation by the robber. *See id.*

Under section 812.13(3)(b), Florida Statutes (1989),FN9 the violence or intimidation may occur prior to, contemporaneously with, or subsequent to the taking of the property so long as both the act of violence or intimidation and the taking constitute a continuous series of acts or events. *See* Jones, 652 So. 2d at 349. The taking of property after a murder, however, does not constitute robbery if the motive for the murder was not the taking of property. *See* Mahn v. State, 714 So. 2d 391, 397 (Fla. 1998) (citing Knowles v. State, 632 So. 2d 62, 66 (Fla. 1993), and Parker v. State, 458 So. 2d 750, 754 (Fla. 1984)).

> FN9. In Jones, 652 So. 2d at 349–50, the Court applied the 1989 version of the State's robbery statute. Since that decision, the Legislature has not changed or amended the robbery statute.

Perry claims that the taking of Johnston's keys and truck was an "afterthought" and that the same was taken merely for the purpose of leaving the scene of the homicide in the motel. Perry further claims that he found Johnston's wallet in the glove compartment of Johnston's truck, and he did not take it from the motel room. The State, however, argues that the evidence was clear that Perry was in need of money and transportation at the time of the murder, and the record is void of any motive other than robbery. Moreover, by rejecting the special jury instruction regarding "afterthought does not constitute robbery," and in specifically finding Perry guilty of armed robbery and felony murder with underlying armed robbery, the jury obviously found the State's evidence more believable than Perry's self-serving claims.

After extensively addressing the "afterthought" issue in Beasley v. State, 774 So. 2d 649 (Fla. 2000), this Court recently opined:

> Where an "afterthought" argument is raised, the defendant's theory is carefully analyzed in light of the entire circumstances of the incident. If there is competent, substantial evidence to uphold the robbery conviction, and no other motive for the murder appears from the record, the robbery conviction will be upheld. Conversely, in those cases where the record discloses that, in committing the murder, the defendant was apparently motivated by some reason other than a desire to obtain the stolen valuable, a conviction for robbery (or the robbery aggravator) will not be upheld.

*Id.* at 662 (citations omitted). Indeed, the facts of the instant case distinguish it "from cases in which there is another apparent motivation for the killing, and no

indication that the defendant wants or needs the valuables which are taken after the murder." Beasley, 774 So. 2d at 666. In this case, Johnston picked up Perry hitchhiking in Alabama, while Perry was on his way from Chicago to South Florida. The evidence is undisputed that Perry was in need of money and transportation at the time of the murder, and he also admitted seeking drugs the night of the murder. Perry took the keys to Johnston's truck (and the truck's "starter chip") from the motel room before taking Johnston's truck and driving it from Pensacola to the West Palm Beach area. Perry also admitted that he took $60 from Johnston's wallet before dumping the wallet in a trash can at a rest stop along the interstate.FN10

> FN10. Perry's version of events, however, raises several inconsistencies. First, Perry specifically told police officers after he was arrested that he took Johnston's wallet from the "motel room." Second, Perry testified at trial that he found Johnston's wallet, containing the $60 and Johnston's license, in the truck's glove compartment. Perry also testified that he sat in the truck while Johnston checked into the motel and, despite being the last one out of the truck once they got to the motel room, Perry never saw Johnston take the wallet from, or put the wallet in, the truck's glove compartment. Yet, there was testimony from a clerk at the motel, that Johnston displayed his driver's license for identification and his AARP card to obtain a senior citizen's discount.

Further, Perry did not just "abandon" Johnston's truck after effecting a getaway. Rather, he drove the truck all the way to south Florida, his original intended destination while hitchhiking. He said he drove the truck in the West Palm Beach area for "a while" and used it for transportation, leaving the tailgate down so as to conceal the license plate whenever he drove it. Moreover, he subsequently "rented" the truck for money in order to buy drugs. Therefore, this case is unlike the cases cited by Perry, where there was "no indication that the defendant wants or needs the valuables" or there "is another apparent motivation for the killing." Id.FN11

> FN11. In Mahn v. State, 714 So. 2d 391, 397 (Fla. 1998), this Court reversed an armed robbery conviction even though cash and an automobile were taken from the victim because the homicides appeared "to have been the product of Mahn's mental and emotional disturbance and prompted by jealousy for the father's attention," rather than a desire to obtain the victim's cash and car. In Knowles v. State, 632 So. 2d 62, 66 (Fla. 1993), this Court rejected the robbery aggravator where Knowles, whom witnesses observed as being "completely gone" from alcohol and inhaling toluene, engaged in the apparently senseless shooting of a young girl he did not even know immediately before shooting his father and taking his father's truck.

In <u>Clark v. State</u>, 609 So. 2d 513, 515 (Fla. 1992), this Court rejected the robbery aggravator (but upheld the pecuniary gain aggravator) where Clark killed the victim "for the purpose of obtaining the victim's paying job," but also took cash and boots from the victim after he was murdered. In <u>Parker v. State</u>, 458 So. 2d 750, 754 (Fla. 1984), this Court rejected the robbery aggravator (but upheld the pecuniary gain aggravator) where "the entire sequence of events in which the murders occurred was touched off by Parker's desire to establish a remunerative drug-dealing network and his need to establish a reputation as a collector of debts," and "[t]he motive expressed at the time of the killing [of one of the victims from whom jewelry was taken] was to keep the victim from implicating the murderers in the death of [another victim]."

As this Court stated in <u>Beasley</u>:

> As in <u>Mahn</u> and <u>Knowles</u>, the evidence in <u>Clark</u> and <u>Parker</u> revealed another apparent motivation for killing the victims (Clark's desire to obtain the victim's job, and Parker's desire to keep the victim from implicating the murderers of a second victim. . . .). Here, in contrast, there is no evidence demonstrating any motive for killing [the victim] other than to take [the victim's] money.

> There is no indication, as in Mahn, of any interpersonal conflict or animosity between [the defendant] and [the victim]. . . . There is no evidence, as in Knowles, that [the defendant] was acting "like he was completely gone" just prior to the murder.

774 So. 2d at 665. Here, as in <u>Beasley</u>, there is no evidence demonstrating any motive for killing the victim other than to take the victim's money. *See* <u>Beasley</u>, 774 So. 2d at 665; *see also* <u>Jones v. State</u>, 652 So. 2d at 350 (rejecting "afterthought" argument as applied to valuables taken from victims where no other motivation for the murders appeared from the record).

> Furthermore, at Perry's request, the court specifically instructed the jury as follows:

> If the evidence shows that the defendant took the victim's property to effect his escape, but that the taking of the victim's property was an afterthought to the use of force or violence which resulted in the death of the victim, the taking of the victim's property does not constitute robbery, but may constitute theft.

In rejecting the "afterthought" exception to robbery and in finding Perry guilty of armed robbery and felony murder with underlying armed robbery, the jury obviously found the State's evidence more believable than Perry's self-serving, and frequently inconsistent, claims.

(Ex. H at 7–18). <u>Perry</u>, 801 So. 2d at 84–89.

Initially, the Florida Supreme Court's determinations as to the elements of premeditated murder and felony murder with the underlying robbery, as well as the definitions of certain terms included in the relevant state criminal statutes are determinations of state law. "[A] state court's interpretation of state law . . . binds a federal court sitting in habeas corpus." <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005); <u>Mullaney v. Wilbur</u>, 421 U.S. 684, 691, 95 S. Ct. 1881, 1886, 44 L. Ed. 2d 508 (1975) ("State courts are the ultimate expositors of state law," and federal courts must therefore abide by their rulings on matters of state law) (citations and footnote omitted); <u>Carrizales v. Wainwright</u>, 699 F.2d 1053, 1055 (11th Cir. 1983). Therefore, this court must defer to the state supreme court's determinations as to those matters.

Viewing the evidence in the light most favorable to the prosecution, the undersigned concludes that the jury could have found the presence of premeditation beyond a reasonable doubt. First, the nature and location of Mr. Johnston's wounds support the finding of premeditation. As noted by the Florida Supreme Court, the wounds were to Johnston's chest and neck, both areas where an attack would produce serious wounds. According to Dr. Lazarchick, four of the seven wounds would have, alone, been fatal. Moreover, Dr. Lazarchick testified that "extensive" force was required for at least one chest wound (Wound #4) as the knife went through Johnston's chest bone, further demonstrating that the victim was carefully stabbed in a deliberate manner in order to effect death.

Second, Dr. Lazarchick testified that the knife used to kill the victim had a single-edged blade and, therefore, could not have been the double-edged "boot" knife which Petitioner carried on his person. From this a reasonable jury could infer that rather than use his own knife, Petitioner obtained another knife to kill Mr. Johnston, which suggests premeditation.

Third, the State's psychologist, Dr. McClaren, testified that Petitioner "was able to engage in purposeful, goal-oriented, intentional behavior during the time period surrounding the homicide." Furthermore, as the Florida Supreme Court noted, despite Petitioner's claimed extreme intoxication,

he recalled with clarity the specific amounts and types of alcohol and drugs he allegedly consumed on the night of the murder, and even the size and brand of cooler in the back seat of the car in which he rode around drinking beer and smoking crack. Moreover, despite his consumption of alcohol and drugs, certain trial testimony pointed to numerous instances of Petitioner's purposeful conduct immediately before and subsequent to the murder, such that the jury was justified in rejecting his theory of inability to form intent. For example, he won several games of pool that he played that evening; upon returning to the motel room, he reversed direction of his sleeping bag because of a light shining in his eyes; after noticing Johnston was dead, he managed to gather all of his belongings, except for a crack pipe under the bed and a pair of broken sunglasses, as well as Johnston's wallet, the truck keys, and the security chip needed to start the truck; and shortly after the time of the murder, Ms. Black, the motel guest in the next room, watched someone who looked very similar to Petitioner drive away in Johnston's truck and the man did not appear to be intoxicated.

Fourth, Petitioner's version of the events immediately preceding Johnston's murder, namely, that Johnston was standing over him masturbating at the foot of the bed and Petitioner jumped up and apparently stabbed him, was contradicted by physical evidence presented by the State that Johnston was lying in bed on his back with the sheet pulled up over his chest at the time he was stabbed.

Finally, the State presented evidence suggesting a plausible motive for the killing, that is, a desire to steal Johnston's property, especially his truck. Petitioner admitted he had little money and no means of transportation, while Johnston had both. The evidence showed that Perry took both Johnston's wallet and his truck, and he later "rented" the truck for money to buy drugs. Moreover, there was no evidence of provocation or hostility between Petitioner and Johnston. Viewing this evidence in the light most favorable to the State, a rational trier of fact could have found premeditation beyond a reasonable doubt.

Likewise, the evidence was sufficient to support Petitioner's conviction for felony murder based upon the underlying robbery. The State presented evidence that Petitioner was in need of money and transportation at the time of the murder; and there was no evidence of a motive other

than robbery.[4]   Additionally, as the Florida Supreme Court noted, the evidence in this case distinguished it from cases in which there was another apparent motivation for the killing and cases in which there was no indication that the defendant wanted or needed the valuables which were taken after the murder.  In this case, Johnston picked up Petitioner hitchhiking in Alabama, while Petitioner was on his way from Chicago to South Florida.  The evidence was undisputed that Petitioner was in need of money and transportation at the time of the murder, and he also admitted seeking drugs the night of the murder.  Petitioner took the keys to Johnston's truck (and the truck's "starter chip") from the motel room before taking Johnston's truck and driving it from Pensacola to the West Palm Beach area.  He said he drove the truck in the West Palm Beach area for "a while" and used it for transportation, leaving the tailgate down so as to conceal the license plate whenever he drove it.  Additionally, he subsequently "rented" the truck for money in order to buy drugs.  Petitioner also admitted that he took $60.00 from Johnston's wallet before dumping the wallet in a trash can at a rest stop along the interstate.

Moreover, the trial court specifically instructed the jury, at Petitioner's request, as follows:

If the evidence shows that the defendant took the victim's property to effect his escape, but that the taking of the victim's property was an afterthought to the use of force or violence which resulted in the death of the victim, the taking of the victim's property does not constitute robbery, but may constitute theft.

(Ex. D at 1206).  The jury obviously rejected the "afterthought" exception to robbery and, in finding Petitioner guilty of felony murder with underlying armed robbery, found the State's evidence more believable than Petitioner's testimony.  Viewing the evidence in the light most favorable to the State, a reasonable fact finder could have found that the taking of Johnston's property was Petitioner's motive for the murder, that the murder and the taking were a continuous series of acts or events, and, thus, that Petitioner intended to rob Johnston during the murder.

Petitioner has failed to show that the Florida Supreme Court's adjudication of his claims was based upon an unreasonable determination of the facts or was contrary to or an unreasonable application of Winship and Jackson.  Therefore, he is not entitled to federal habeas relief.

V.    CERTIFICATE OF APPEALABILITY

---

[4] Although Petitioner claimed that he had no motive for murder, and his actions were an impulsive overreaction to a perceived threat, the jury obviously rejected this self-serving testimony.

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that Edwin G. Buss is substituted for Walter A. McNeil as Respondent.

And respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (Doc. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 24th day of February 2011.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

    **Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon the magistrate judge and all other parties. Failure to object may limit the scope of appellate review of factual findings.** *See* **28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**